**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

DANIEL PEDRAZA                                                    PETITIONER
ADC #155040

v.                                    5:17cv00037-DPM-JJV

WENDY KELLEY, Director,
Arkansas Department of Correction                         RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge D.P. Marshall Jr.  Any party may serve and file written objections to this recommendation.  Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a new hearing for this purpose before either the District Judge or Magistrate Judge, you must, at the time you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the new hearing (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The details of any testimony desired to be introduced at the new hearing in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the new hearing.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing.  Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

**DISPOSITION**

## I.      INTRODUCTION

Daniel Pedraza has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging fifteen violations of his federal constitutional rights arising from his guilty plea in Drew County Circuit Court for the first-degree murder of his two-year-old stepdaughter, Aubriana Coke. (Doc. No. 2.)  Mr. Pedraza's claims are:

1.      The prosecution violated his due process rights by offering inconsistent theories of Aubriana's death in Mrs. Pedraza's case, *i.e.*, permitting abuse of a minor as opposed to murder.

2.      The prosecution relied on the false testimony of the medical examiner in Petitioner's case.

3.      Petitioner's counsel were ineffective in failing to rebut or impeach the medical examiner's testimony as to Aubriana's cause of death with an Arkansas Department of Human Services' report finding a January 10, 2012, report of abuse on Aubriana unfounded.

4.      Petitioner's plea to first degree murder was coerced by his attorneys, directly or indirectly.

5.      Petitioner was constructively denied his right to counsel in that his lawyers overcame his will and coerced him into taking a plea bargain.

6.      Petitioner was denied his right to a jury trial on the issue of guilt.

7.    Petitioner's case was not an adversary process because his lawyers forced him into taking a plea bargain.

8.    Petitioner's counsel were ineffective because they did not raise the Prosecutor's statement in Mrs. Pedraza's case that Aubriana's death was an accident.

9.    Petitioner's counsel were ineffective because they did not raise Mrs. Pedraza's violent tendencies in Mr. Pedraza's case.

10.    Petitioner's counsel were ineffective because they did not raise the possibility that Aubriana's death was caused by abuse or corporal punishment at the hands of other adults, including but not limited to Fatima Thomas.

11.    Petitioner's counsel were ineffective because they did not use the medical examiner's statement that Aubriana had suffered many non-life-threatening injuries before the night and morning of her death to Petitioner's benefit.

12.    Petitioner's counsel were ineffective because they failed to use the aforementioned DHS report to his benefit.

13.    Petitioner was denied a public trial.

14.    Petitioner was denied his right to be present during court proceedings.

15.    Petitioner's counsel were ineffective at his sentencing trial for failing to object to or rebut the medical examiner's testimony.

(Doc. No. 2 at 11-22.)

The State has responded (Doc. No. 12) and Petitioner replied (Doc. No. 19). After carefully reviewing Petitioner's claims, for the following reasons, I find his claims are procedurally defaulted, adequately addressed by the State courts, or without merit. Accordingly, I recommend the Petition be DISMISSED.

## II.    PROCEDURAL HISTORY

The State originally charged Mr. Pedraza and his wife, Victoria Pedraza, with capital murder, in violation of Arkansas Code Annotated § 5-10-101, and permitting abuse of a minor, in

violation of Arkansas Code Annotated § 5-27-221, respectively.  (Doc. No. 12, Ex. A at 20.)  The charges stemmed from the February 27, 2012, death of Mr. Pedraza's twenty-seven-month-old stepdaughter, Aubriana Coke.  (*Id.*)  The State sought the death penalty against Mr. Pedraza.  (*Id.* at 21.)  After a contentious process involving an interlocutory appeal (*Pedraza v. Drew County Circuit Court*, 2013 Ark. 116) and two motions to recuse the trial judge (Doc. No 12, Ex. A at 441a and 514), on June 1, 2013, Mr. Pedraza entered a negotiated guilty plea to a lesser included offense of murder in the first degree.[1]  (*Id.* at 898-915.)  During the plea colloquy, the court established Mr. Pedraza was not under the influence of anything at the hearing (*Id.* at 902-903); he was not suffering from any emotional disturbance that would affect his ability to make a rational decision about pleading guilty (*Id.* at 903); he understood the nature of the charge to which he was pleading (*Id.* at 903-904); he understood the punishment range (*Id.* at 904); he agreed to be sentenced by a jury (*Id.*); he understood his rights to a jury trial on the issue of guilt and his rights to cross-examine the State's witnesses, and he was voluntarily waiving those rights (*Id.* at 904-905); he understood that he had a right to call his own witnesses and present his own evidence, and a jury would have to be unanimous in its verdict to find him guilty.  (*Id.* at 905.)  The court then had the following conversation on the record with Mr. Pedraza:

> COURT:  Have you discussed this case fully with your lawyers who are here with you today?

---

[1] Ark. Code Ann. § 5-10-102. Mrs. Pedraza entered a guilty plea to the charge of permitting abuse of a minor on July 24, 2012.  Included in the terms of her plea agreement was an obligation to testify against Petitioner.  She also agreed, as did Mr. Pedraza, to be sentenced by a jury.  After Petitioner's sentencing trial, a Drew County jury sentenced her to twenty years of incarceration-the maximum confinement legally possible in Arkansas for the charge.  The terms between the State and Mrs. Pedraza (she pled guilty to permitting abuse; the State dismissed without prejudice the charge of capital murder and she agreed to testify truthfully against Mr. Pedraza) were partially recited at Doc. No 12, Ex. A. at 2106.  The remaining terms were summed up by the state trial court.  (*Id.* at 541.)  Her sentence was recited by the Arkansas Court of Appeals in her appeal, *Pedraza v. State*, 2015 Ark. App. 205, at 1.

[PETITIONER]:  Yes, sir.

COURT: Now, I understand that at some point in time, according to you and to some extent them, that you all weren't talking very much.  I want to get on the record now as to whether or not that still continues and whether or not you all are talking and you are satisfied with their advice.

[PETITIONER]: I have communicated with them and I am satisfied with them.

COURT:  Do what now?

[PETITIONER]: I have communicated with them and I am satisfied with what they're doing.

COURT:  All right.  Is there anything that I need to know?  When you say you've communicated, in your opinion you've communicated enough to make a decision on this?

[PETITIONER]: Yes, sir.

COURT:  Has your decision to plead here today, if you do so, to first degree murder, been the result of any type of threat or influence, undue influence, undue type of pressure that you shouldn't be under from some other person?  Have you been pressured?

[PETITIONER]:  No, sir.

COURT: Such that it's affected your clear thinking?

[PETITIONER]:  No, sir.

(*Id.* at 905-906.)

And later, the following colloquies occurred between the prosecutor, Petitioner, his counsel, and the court:[2]

[PROSECUTOR]: Your Honor, perhaps with an explanation.  The proof will be that the fatal injury inflicted on the child was the last injury, which was a sharp blow to the abdomen.  As I understand it, Mr. Pedraza is going to admit that he administered that blow without making any comments or representations as to the other non-life threatening injuries that the child also suffered.  And him admitting that is not the exclusion of the State showing those others for the purposes of sentencing.

---

[2] It is unclear from the record whether this was a sworn statement or not.

[DEFENSE COUNSEL]:  And, Your Honor, we will in that regard, we understand that the State may intend to so seek and it would be our position that we would, you know, object and obtain a ruling from the Court at that time on that issue.  But Mr. Deen [the prosecutor] and I understand each other on that issue.

COURT:  Well, I thought about that once you all called me.  You know, and that is one reason I am not going to require the defendant in order to simply accept a plea to go into tedious and self-incriminatory detail about any or everything that may have happened to the child, just a sufficient factual basis to establish a factual basis for the plea. . .

(*Id.* at 909-910.)

COURT:  Mr. Pedraza, if you tell me - - you can look at your statement - - if you go along the lines of that statement you have signed, then I will accept a guilty plea.  If you don't stick to the statement then I've been pushed in a corner and I can't.  So I ask you how you plead to the charge of first degree murder, guilty or not guilty?

[PETITIONER]:  Guilty.

COURT:  What?

[PETITIONER]:  Guilty.

COURT:  Tell me what you did that would cause the Court to believe you did it.

[PETITIONER]:  On or about February 26th through February 27th, 2012, in Drew County, Arkansas, I knowingly caused an injury to my step-daughter, Aubriana Coke, a child less than fourteen years of age, that resulted in her death, including the fatal blow to her abdomen.

COURT:  Very well.  The Court finds a factual basis for the plea of guilty.  The Court also finds as a matter of fact that it was knowingly and voluntarily entered and the defendant has waived his constitutional rights associated with the trial of guilt.  You understand you also cannot appeal the guilty [sic], a free appeal, do you understand that, if you plead guilty?

[PETITIONER]:  Yes, sir.

(*Id.* at 911-913.)

Petitioner also signed a plea statement reducing those understandings to writing. (*Id.* at 527-529.) In connection with the plea, Mr. Pedraza also executed a waiver stating, among other things, that he voluntarily waived appellate review of all adverse rulings from the trial court prior to the entry of his plea. (*Id.* at 530.) After a three-day sentencing hearing, a Drew County jury sentenced Petitioner to life in prison. (*Id.* at 538.)

Mr. Pedraza timely appealed the only issue he could have after the sentencing - that the trial court erred in limiting further voir dire of the jury after he agreed to be sentenced by the jury seated (but not yet sworn) to hear his case on the merits. The Arkansas Supreme Court affirmed the trial court's ruling. *Pedraza v. State*, 2014 Ark. 298. Petitioner then timely filed a Rule 37 petition with the trial court (heard by a different judge). The trial court dismissed his Rule 37 petition, and Mr. Pedraza filed a timely appeal to that decision as well. The Arkansas Supreme Court once again affirmed. *Pedraza v. State*, 2016 Ark. 85. Thereafter, on February 13, 2017, Petitioner filed the instant Petition for Writ of Habeas Corpus. (Doc. No. 1.)

## III.  FACTS

As noted above, Mrs. Pedraza agreed to testify truthfully against Petitioner as part of her plea agreement. At Mr. Pedraza's sentencing trial, she testified she met Mr. Pedraza in 2009 at Ft. Chaffee when they were both in the National Guard. They were in different units but sometimes trained together. (Doc. No 12, Ex. A at 1564.) Victoria was pregnant when they met. Aubriana was born on November 17, 2009. They did not become romantically involved until the summer of 2011. (*Id.* at 1565.) Aubriana was nineteen or twenty months old when they started to date. (*Id.* at 1566.) Mrs. Pedraza testified that they (Mr. Pedraza, herself, and Aubriana) moved into a camper behind her grandmother's house in August 2011. She then began to talk about a pattern of physical and emotional abuse she and Aubriana suffered at Mr. Pedraza's hands. She testified,

for example, that Mr. Pedraza used food as punishment. If he asked Aubriana, "Are you hungry?" and she failed to answer correctly, to Mr. Pedraza's definition of correctly, "Yes" or "No," Mr. Pedraza would not allow her to eat. Incorrect answers would include a lisp or "uh-huh." (Id. at 1568-1569.) According to Mrs. Pedraza, Mr. Pedraza would control not just whether Aubriana could eat, but what she could consume. Mrs. Pedraza found it odd that a man who had just come into the picture would be trying to dictate these kinds of things for her daughter. Mr. and Mrs. Pedraza had a disagreement about whether Aubriana should have chocolate milk. Mr. Pedraza said all that sugar was bad for her digestive system; Mrs. Pedraza said she was a child and would do typical childish things. When Mrs. Pedraza would try to intervene with Mr. Pedraza on the way he disciplined Aubriana, Mr. Pedraza would beat Mrs. Pedraza. She stated that on different occasions, he hit her with a belt, slapped her, kicked her, choked her, and held a knife to her throat. She testified that Mr. Pedraza hit her in the head with a bat and drug her by her hair. (Doc. No. 12, Ex. A at 1570-1571.) Mrs. Pedraza considered leaving him and even attempted to move out once, but she was afraid of Mr. Pedraza. Mrs. Pedraza testified that he threatened her life many times and he said he had nothing to lose by killing her. If she said she wanted to leave, Mr. Pedraza told her nobody wanted her; she had a brat for a daughter; she was too ugly and fat for anybody else to have; and she should be thankful and glad Mr. Pedraza was with her. On occasion, he would refer to Aubriana as "little bitch," an epithet that eventually became common. He would also call her "white trailer trash" and "brat." Mrs. Pedraza said he would never call Aubriana by name. (Id. at 1572-1573.) Beyond using food as punishment and calling Aubriana various harsh names, Mrs. Pedraza testified that Mr. Pedraza used physical punishment on Aubriana. He made Aubriana get in the "pushup position," with her legs extended, toes on the floor, her arms extended and holding the position. Mr. Pedraza would also have her assume the "chair position," where her

8

back was against a wall and her knees were bent at a ninety-degree angle, with no support under her backside.  Aubriana did not question why she was doing this; she just did it.   (*Id.* at 1573-1575.)  Sometimes she would have to hold either or both of these positions for as long as an hour.  (*Id.* at 1576.)

Mrs. Pedraza also testified that Mr. Pedraza's abuse of Aubriana became more intense, especially after they all moved into their own place.  She said Mr. Pedraza would beat Aubriana on top of her head with a belt, he would hold her head under the faucet in the tub and he would deny her sleep as well as food.  Mrs. Pedraza testified that sometimes, Mr. Pedraza would force her and Aubriana to eat off plates on the floor with their hands, stating that they "were acting like dogs and needed to be treated like one."

Mrs. Pedraza also testified that if she or Aubriana so much as looked at Mr. Pedraza in a way that he perceived to be wrong, he would punish them.  On the Friday night before Aubriana died, Mrs. Pedraza looked at Mr. Pedraza in a way that displeased him.  He directed her to take her clothes off and bend over their bed.  He made Aubriana watch as he beat her mother with a belt over her mother's naked body, saying, "Bitch, this is how you are going to turn out if you don't do what you are supposed to do."  After the beating, Mrs. Pedraza was in the floor, crying.  Aubriana came in, wiped her mother's tears away, and said, "Mama, don't cry, please."  Mrs. Pedraza testified that Aubriana had learned that crying made Mr. Pedraza "more angry."  Mrs. Pedraza said that Mr. Pedraza beat her so severely that she could not sit.  She tried to turn, and to run, but he caught her, grabbed her hair and started using his fist.  (*Id.* at 1578-1580.)  The State introduced photographs into evidence (*Id.* at 2110-2117) taken after Mrs. Pedraza was arrested in connection with Aubriana's death, approximately six days later.  The photographs showed bruises on Mrs. Pedraza's arm, shoulder, legs and buttocks.  She testified that the bruises were caused by

Mr. Pedraza's beating.  (*Id.* at 1580-1581.)

On the weekend of Aubriana's death, Mr. Pedraza had military duty and was supposed to be gone all Saturday.  When asked why she did not take Aubriana and leave that day, Mrs. Pedraza stated that she did not have a car because Mr. Pedraza took their only vehicle and had told her not to call anyone on her phone.  He also said he would check her phone.  Mrs. Pedraza testified that he made good on that statement when he returned home that Saturday evening.  (Doc. No. 12, Ex. A at 1583-1584.)

Mrs. Pedraza testified that nothing particularly bad happened that Saturday night.  But on Sunday morning, Mr. Pedraza asked Aubriana a question and she did not respond correctly so he sent her to her room for timeout.  In timeout, she was supposed to stand facing the corner with her hands behind her back.  She was wearing a pull-up diaper, as she was not yet fully toilet trained. (*Id.* at 1584-1585.)  After Aubriana spent a while in timeout, Mr. Pedraza called her back to ask her something; she didn't answer correctly.  Mr. Pedraza was sitting on a couch and Aubriana was standing in front of him.  When she did not answer the way he wanted, he hit Aubriana in the stomach with his fist.  She fell down but stood right back up.  He then stated "Bitch, just go back to timeout.  I don't feel like dealing with you right now just go back in timeout."  Mr. Pedraza went into Aubriana's room shortly thereafter, pulled her diaper down and whipped her with a belt. He then placed Aubriana face up in the bathtub and ran water over her face.  Aubriana was kicking and Mr. Pedraza tried to hold her mouth open for the water.  Aubriana bit his finger so he hit her in the face and pushed her down in the bathtub.  (*Id.* at 1586-1588.)

Mrs. Pedraza's testimony is not exactly clear as to what happened next.  The record states:

[MRS. PEDRAZA]: [H]e hit her twice as hard in her stomach while she was in the bathtub-

. . .

10

> [PROSECUTOR]: After she bit his finger and then he hit her twice in the stomach
> when she was in the bathtub, take it from there.

(Doc. No. 12, Ex. A at 1588).  It is unclear as to whether Mrs. Pedraza testified that Mr. Pedraza

hit Aubriana with twice the force as he hit her at the couch, or that he hit her two times in the

bathtub, or both.  Regardless, Mrs. Pedraza said that when she came in from the kitchen and saw

what was happening, she tried to pull Mr. Pedraza off of Aubriana.  She went on to say that after

he hit Aubriana, she was lying in the bathtub gasping for air.  Mr. Pedraza told Mrs. Pedraza, "Get

the bitch out of the bathtub and dry her off and get her on some clothes."   Mrs. Pedraza did as he

instructed and Mrs. Pedraza described Aubriana as "real weak" at that point.  Mr. Pedraza then cut

up tomatoes, put them in the microwave oven, placed the warm tomatoes in a towel and rubbed

them on Aubriana's stomach. (*Id.* at 1588-1589.)  He also cracked a raw egg, and placed the egg

into some holy water he kept at home.  Mr. Pedraza described that to Mrs. Pedraza as a blessing

and cleansing ritual.  Mrs. Pedraza also described that before Aubriana was in the bathtub, she had

urinated on the floor and he stepped in it.  He placed her in the "chair" position.  He kneeled in

front of Aubriana and said to her, "You know better than that.  Bitch, you're so stupid.  Are you

supposed to be doing that?"  She didn't answer, and he punched her in the stomach.  She fell down.

(*Id.* at 1589-1590.)  At various times during that day (Mrs. Pedraza said she lost track of time), he

would have her check on Aubriana.  He had her rub frozen things on Aubriana to keep bruises

from appearing where he had hit her with the belt.  Aubriana began to vomit.  Mr. Pedraza called

Mrs. Pedraza a "stupid, piece-of-shit mom."  He told Mrs. Pedraza that she needed to find out why

Aubriana acted the way she did; that if Mrs. Pedraza wasn't such a bad mother, he wouldn't have

to treat Aubriana like that.  (*Id.* at 1591-1592.)

The egg, tomato and holy water had no effect on Aubriana; she began to shiver.  Mr.

Pedraza had Mrs. Pedraza put pajamas and a jacket on Aubriana, and he told Aubriana that the

reason she was cold was that her blood wasn't circulating correctly.  He made Aubriana get up and walk around.  Aubriana stumbled, and Mr. Pedraza pushed her and kicked at her.  Mrs. Pedraza said that Aubriana was hunched over in obvious pain.  After the stumbling, kicking and punching continued, Mr. Pedraza told Mrs. Pedraza, "Come on, let's go to bed."  (Doc. No. 12, Ex. A at 1593.)   As the couple was preparing for bed, Aubriana vomited on her pajamas.  Mrs. Pedraza took the soiled clothes off of Aubriana; Mr. Pedraza said to Mrs. Pedraza not to replace them because "she's just going to mess them up too."  Aubriana vomited again in the master bathroom.  Her breathing was audible.  Mr. Pedraza told Mrs. Pedraza, "Shut that little bitch up.  I'm tired of hearing that.  I've got to go to sleep."  Aubriana threw up again and continued vomiting.  Mrs. Pedraza sat in the bathroom with her most of the night.  When Mrs. Pedraza returned to bed, she slept with her hand on Aubriana's chest.  When Mrs. Pedraza woke up, Mr. Pedraza asked her how Aubriana was.  Mrs. Pedraza said her breathing was shallow and Aubriana was "real weak."  Mr. Pedraza called his mother who instructed him to put rubbing alcohol on a towel and rub the towel under Aubriana's nose.  (*Id.* at 1595.)  Mrs. Pedraza did as her mother-in-law instructed, to no avail.  Aubriana was neither speaking nor crying.  At some point, Mr. Pedraza gave her a capful of water to try to drink; Mrs. Pedraza said Aubriana neither swallowed it nor spit it out.  Aubriana took a deep breath and did not exhale.  Mrs. Pedraza shook her and called her name.  Mrs. Pedraza called out to Mr. Pedraza, "Oh my God, Daniel.  She's not breathing."  Mrs. Pedraza began CPR on the bed.  She testified that Aubriana was just bouncing off the bed as she was attempting chest compressions.  Believing the bed was not firm enough, Mrs. Pedraza moved her to the floor.  She told Mr. Pedraza to call 9-1-1.  He responded, "And tell them what, Vicky?"  Mrs. Pedraza responded that she didn't know, she just needed his help.  Mr. Pedraza then went into the kitchen to look for a knife.  He came out and said, "If that little bitch dies, I might as well kill you too."

Mrs. Pedraza said, "Daniel, kill me later.  Just help me, please."  Mr. Pedraza called 9-1-1 at that point.  (Doc. No. 12, Ex. A at 1596-1597.)  Mrs. Pedraza stated that Aubriana appeared to her to be already dead by then.  (*Id.* at 1598.)  Mrs. Pedraza continued CPR anyway while waiting for the paramedics to arrive.  When the paramedics arrived, Aubriana did not show signs of life and they transported her to Drew Memorial Hospital.  Mr. and Mrs. Pedraza followed the ambulance.  Shortly after they arrived, nurses escorted them to a private room.  The attending physician came in and told Mrs. Pedraza that there was nothing further they could do for Aubriana.  (*Id.* at 1600-1601.)  After Mrs. Pedraza left the hospital, sheriff's deputies went back with her to their house.  The deputies began taking pictures and collecting evidence.  Deputies took Mr. Pedraza directly from the hospital to the Sheriff's Office for questioning.  Between the time Mr. Pedraza called 9-1-1 and the time the ambulance arrived, Mrs. Pedraza came up with the idea to tell authorities that Aubriana had fallen off the dock at Lake Monticello and hit her stomach on rocks there.  Mr. Pedraza agreed with this, and that is the story Mrs. Pedraza initially told police.  (*Id.* at 1602-1604.)

Stephen Erickson, M.D., Deputy Chief Medical Examiner at the Arkansas State Crime Lab, performed the autopsy on Aubriana.  (*Id.* at 1692.)  He testified that Aubriana "died of multiple blunt force injuries."   He explained that she had numerous bruises, abrasions and one laceration.  The injuries were to multiple parts of her body; the head, the chest, the abdomen, the back, the buttocks, and the extremities.  Dr. Erickson stated that Aubriana died within the scope of all of those injuries, but that one single blow ended her life - a single blow to her abdomen.  "The blow to the abdomen was hard enough and narrow enough, that is, not on a big surface, but narrow enough and hard enough to compress all the structures below the liver, against her spine, and caused the first part of the small intestine to be ripped in half."  (Doc. No. 12, Ex. A at 1697.)  When the tube of her intestine ripped apart, bile, acid, food, and bacteria began going into

Aubriana's peritoneum.  When that kind of material leaks into the stomach, a person will vomit it.

Other physiological changes would occur, such as abnormalities in salt and bacteria in the blood.

The bacteria in the blood would cause sepsis.  The person having this type of injury would have

been very sick; a doctor would have recognized how sick an hour before she died.  Dr. Erickson

also testified that Aubriana had a number of other injuries, none of which were fatal in and of

themselves, but they were "very, very serious.  They are injuries of chronic child abuse: bruises,

multiple bruises of the whole scalp, enough scarring on the scalp that I was even surprised.  I have

never seen that much scarring on a child's scalp."  Dr. Erickson went on to describe injuries to

Aubriana's liver and stomach.  He further stated that Aubriana's mesentery, a fan-like structure of

tissue that supports and supplies internal organs in the abdominal cavity, was also lacerated by the

blow that ended her life.  However, the mesentery also had "a bunch" of scarring, indicating that

it had been injured before the fatal blow.  (*Id.* at 1698-1699.)  Perhaps most significantly, he

testified:

> Do you want to train physicians, teachers, nurses, to see what an abused child looks
> like?  Show this child's picture.  And that was before this last injury that took place.
> So that's what happened to Aubriana Coke.  She died in the confines of prolonged,
> repeated child abuse with the final injury being a hard blow to her abdomen, which
> separated that intestine and caused that physiological disarrangement that led to her
> death.

(*Id.* at 1700.)

## IV.    ANALYSIS

### A.    Claims of Coerced Guilty Plea, Constructive Denial of Counsel, Lack of a Jury
### Trial for the Guilt Phase and Lack of Adversary Process

A finding of a coerced or involuntary guilty plea would invalidate the Drew County Circuit

Court proceedings.  "Of course, agents of the State may not produce a plea by actual or physical

violence or mental coercion overbearing the will of the defendant."  *Brady v. United States*, 397

U.S. 742, 750 (1970). Petitioner enumerated all four of these grounds separately, and while each has subtle factual variations, all have at their root one common, core allegation - that Petitioner's guilty plea was not a product of his own free will. But contrary to those allegations are Petitioner's written, signed plea statement (Doc. No. 12, Ex A. at 527-529) that he was not under any undue influence at the time he pled guilty and his verbal statements in open court to the same effect. (*Id.* at 905-906.)

First, I note that Petitioner's claim that his sisters were threatened with "INS" and deportation were not raised in any of the state court proceedings. In fact, none of the sisters' allegations about the circumstances leading up to their visit with Petitioner to encourage him to plead guilty appear to have been raised or litigated in state court. The same is true, in this analysis, for his claims that he did not receive a jury trial, and he was constructively denied counsel. Mr. Pedraza did raise, in his appeal of the denial of his Rule 37 petition, the claim that his counsel coerced him in to taking a guilty plea. *Pedraza v. State*, 2016 Ark. 85, at *7. Those claims and arguments which Petitioner did not raise with state courts are subject to procedural default.

Before filing a federal habeas petition, a state inmate must first "fairly present" the substance of his or her federal habeas claims to the appropriate state courts. *Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011) (*citing Baldwin v. Reese*, 541 U.S. 27, 29 (2004)). The fair-presentment requirement exists so that the respective state has the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights. *Murphy*, 652 F.3d at 849 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971) ("We have consistently adhered to this federal policy, ''for it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation' " (quoting *Darr v. Burford*, 339

U.S. 200, 204 (1950)); *Lenza v. Wyrick*, 665 F.2d 804, 807-08 (8th Cir. 1981).  When an inmate fails to comply with the fair-presentment requirement, his or her claims will be procedurally defaulted.  *Murphy*, 652 F.3d at 849.

If it would be futile for a petitioner to return to the state courts to present his or her claim, the exhaustion requirement in § 2254(b) is satisfied, "but th[is] failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'"  *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996))).

After carefully reviewing the record, I conclude that Mr. Pedraza's claims relating to his sisters, the lack of a jury trial, and the constructive denial of counsel are all procedurally defaulted. All of these claims were known or knowable to Mr. Pedraza at the time he filed his Rule 37 petition with the trial court, as they all allegedly happened at or before the time of his plea hearing.  Mr. Pedraza offers no basis for excusing the procedural default for these claims, and there is no indication in the record that cause or prejudice exists.  Furthermore, the specific allegations Mr. Pedraza now raises, that his sisters were threatened by defense attorneys with deportation, were known to him or could have been known with the exercise of reasonable diligence by the time – at the latest – he filed his Rule 37 petition.

Pursuant to 28 U.S.C. § 2254(e)(2)(ii), this Court is bound to consider the instant Petition in the light of the evidence the state courts had before them, unless the factual predicate could not have been developed with reasonable diligence by Petitioner in state courts.  *McGhee v. Norris*, 588 F.3d 1185, 1194 (8th Cir. 2009) (*citing Holland v. Jackson,* 542 U.S. 649, 652 (2004).  Mr. Pedraza offers no reason why the particulars of the alleged actions of his attorneys with respect to

his sisters - which he says occurred on May 31 or June 1, 2013 - could not have been raised in his Rule 37 petition filed in 2014. I find that the claims of indirect coercion and harassment of Mr. Pedraza's sisters were known or could have been known to him by the exercise of reasonable diligence, and this Court therefore should not consider those specific claims.

Additionally, I find Mr. Pedraza's latest evidence (Doc. No 19 at 10) fails to provide a basis for relief. Even if true, the fact that Mr. Pedraza's sister was not allowed to be a part of the plea bargaining process does not amount to coercion nor does it implicate any of his constitutional rights.

With respect to Pedraza's claim that his counsel coerced him into taking a plea with promises of a new trial or a lighter sentence, the Arkansas Supreme Court held,

> [Petitioner] also argued in his Petition that counsel coerced him to enter the plea by assuring Pedraza that he would likely obtain a new trial or a lesser sentence on retrial. The argument was unclear in that it was the jury's task to determine the appropriate sentence within the range of sentencing for the offense to which Pedraza had pleaded guilty. There was no provision by which the jury would grant a sentence less than the minimum sentence within the range or order a new trial. Pedraza did not offer facts to demonstrate that his plea was coerced.

*Pedraza v. State*, 2016 Ark. 85, at *7. This particular claim was fully adjudicated in Arkansas courts. When examining a habeas claim in light of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (d)(4), federal courts take a deferential view of decisions reached on issues fully adjudicated in state courts. As the Eighth Circuit Court of Appeals recently said:

> Under AEDPA, habeas relief will not be granted with respect to any claim adjudicated on the merits in State Court proceedings, unless such adjudication resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "AEDPA's highly deferential standards kick in" where the prisoner's claim has been adjudicated on the merits in state court. *Davis v. Ayala*, 135 S. Ct. 2187, 2198, 192

> L. Ed. 2d 323 (2015) (*citing Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). Where a state court holds that any federal error was harmless beyond a reasonable doubt, the decision constitutes an adjudication on the merits. *Id.* If a prisoner's constitutional rights were violated as a result of the state court's decision, the prisoner must also demonstrate that the error was prejudicial, as federal courts may not grant habeas relief unless the error in the state trial had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

*Davis v. Grandlienard,* 828 F.3d 658, at 664 (8th Cir. 2016). 28 U.S.C. § 2254(d)(1); *see also Collier v. Norris*, 485 F.3d 415, at 421 (8th Cir. 2007).

For purposes of 28 U.S.C. § 2254(d)(1), "[a] state court decision is 'contrary to' clearly established federal law if it either 'arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law' or 'decides a case differently than th[e] [Supreme] Court has on a set of materially distinguishable facts.'" *Worthington v. Roper*, 631 F.3d 487, 495 (8th Cir. 2011). Additionally, "[a] state court 'unreasonably applies' Supreme Court precedent if it 'identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). I do not find that the Arkansas Supreme Court's decision in this case is contrary to any clearly established federal law or that it is an unreasonable application of federal law to the facts of this case.

Furthermore, even if Mr. Pedraza's claims with respect to coercion are not procedurally defaulted or adequately and fairly determined by state courts, I find that all of them fail on the merits. Examining Petitioner's first specific claim of coercion (as raised in the instant Petition), he states that his sisters came to visit him in jail after the jury was seated in his case and begged him to take the plea, because if he were found guilty, he would be sentenced to death. He then goes on to state that after his sisters' visit, all three of his attorneys came to the jail and "picked up

where the sisters left off."  Petitioner claims that his attorneys told him he was not going to get a

fair trial with that particular judge and the conviction would be reversed and Petitioner would get

a new trial.  Petitioner says the attorneys did not advise him, however, that he was waiving trial

errors when he entered a guilty plea.  (Doc. No. 2 at 15.)  In addition, Petitioner attaches to his

Petition the written statements[3] of his sisters alleging, among other things, that defense counsel

threatened to report the sisters to Immigration and Naturalization Services[4] and have them deported

if either of them ever revealed their conversations with the attorneys.  (*Id.* at 28-30.)

On the merits, I do not find these allegations amount to coercion.  Clear authority

establishes that a defendant's fear of a greater penalty, even death, is not "coercion" in the sense

of a plea agreement.  *Brady,* 397 U.S. at 757-759; *United States v. Morgan,* 958 F.2d 847, 850 (8th

Cir. 1992) (*citing North Carolina v. Alford*, 400 U.S. 25 (1970)).  Furthermore, taking as true for

purposes of this decision that Mr. Pedraza's counsel threatened his sisters with deportation (a claim

I find dubious, at best), that fact would not rise to the level of coercion either, because neither Mr.

Pedraza nor his sisters state the alleged deportation threats were communicated to Mr. Pedraza

before he decided to enter his plea.  It is also of some note that the specifics of the alleged threat -

to have the sisters deported if they *told others* about the attorneys' conversations with them to

convince Petitioner to plead guilty - are not the same as telling them that they were under an

obligation to change Mr. Pedraza's mind about taking the plea. They were threats premised,

allegedly, on disclosing the conversations.  Finally, on the merits, the Petitioner said in open court

---

[3] The Petitioner calls these statements "affidavits", but they are not acknowledged by a notary public.

[4] INS no longer existed under that name in 2013, when these conversations were alleged to have taken place.  The agency responsible for those functions in the federal government has been known as Immigration and Customs Enforcement since 2003.  That fact casts further doubt in my mind as to the veracity of this particular claim.

and in writing in an exhibit in the record that his decision to plead guilty had not been the product

of undue influence, duress or anything else that kept him from making a knowing, voluntary

decision.   The state court specifically found that he entered his guilty plea knowingly and

voluntarily.   The state trial court's factual determination that Mr. Pedraza's guilty plea was

knowingly and voluntarily entered is entitled to the presumption of correctness, and Petitioner

bears the burden of coming forward with clear and convincing evidence that rebuts that

presumption.  28 U.S.C. § 2254 (e)(1).  He has offered no such evidence.

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary.  If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.

*United States v. Broce*, 488 U.S. 563, 569 (1989).  *See also Florida v. Nixon*, 543 U.S. 175 (2004)

(decision of counsel to concede guilt in a death-penalty case and focus on mitigation in the penalty

phase does not automatically equate to ineffective assistance of counsel.)

Likewise, because the coerced plea allegation is part and parcel of Mr. Pedraza's ideas that

he was constructively denied counsel, denied adversary process (a restatement of the constructive

denial of counsel claim) and was denied a jury trial, those claims are meritless and should also be

denied.   Even a liberal reading of the Petitioner's *pro se* pleadings in this case (*See, e.g., Petty v.

Card,* 195 F.3d 399, 400 (8th Cir. 1999)) reveals that the denials of counsel[5] and jury trial claims

are either restatements of his coercion claims or alternative statements of the rights he asserts were

---

[5] With respect to the denial of adversary process, the defendant raised a similar claim in *Nixon.*
Counsel in that case conceded guilt, and put on an extensive mitigation case in the penalty phase.
That appears to be procedurally very similar to what happened in this case.  Evaluating his lawyer's
decisions as to trial strategy, the *Nixon* Court found that counsel's performance was not
constitutionally deficient.  543 U.S. at 188.

denied to him as a result of the coercion claims.  In any event, these claims are subject to the same merits analysis and the same outcome.  In deferring to the state court's finding that Mr. Pedraza's plea was both counseled and voluntary, the legal conclusion is compelled: the instant Petition should be dismissed.

This is perhaps the most appropriate time and place to offer the following analysis.  In this case, the death penalty was a very real possibility for Mr. Pedraza.  If the jury believed his wife's testimony, and that testimony was corroborated and reinforced by the testimony of Dr. Erickson (and others, including the emergency room staff and law enforcement not specifically recited in this opinion), he was in genuine jeopardy of a death sentence.  Again, according to both his wife and the medical examiner, Aubriana, a child of barely two years, suffered constant, deliberate brutality at the hands of Petitioner.  Mrs. Pedraza likewise suffered shocking physical, mental and emotional abuse.  The weekend of Aubriana's death, that brutality turned into savagery.  Both juries hearing the evidence in this case returned the maximum respective sentences available under law to each of them.  It is not at all a stretch to conclude that Petitioner's jury, "death qualified", would have returned a sentence of death had they had that option.  Mr. Pedraza's attorneys succeeded in getting the death penalty off the table and very possibly made sure his life was spared.  Counsel's overall performance is to be judged in the totality of the circumstances and evidence in a given case.  *United States v. Frederick,* 775 F. Supp. 2d 1146, 1148 (D.S.D. 2011) (*citing Strickland v. Washington,* 466 U.S. 668, 695 (1984).  In light of the overall circumstances and the totality of the evidence in this case, I have no trouble concluding that Mr. Pedraza received constitutionally effective assistance of counsel.

**B.     Claim of Alternative Prosecution Theories for Petitioner's Case and Mrs. Pedraza's Case**

Petitioner's claim that the State used a different theory in prosecuting his case was also not presented to the state courts, and is procedurally defaulted and should be dismissed.  Furthermore, as the Respondent points out, Petitioner and Mrs. Pedraza pled guilty to different offenses.  (Doc. No 12 at 49, n.2.)  A prosecutor may not advance separate, factually contradictory theories in different trials for codefendants in the same case. "The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000).  However, the *Smith* court went on to say, "We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process." *Id.* at 1052.  Mr. Pedraza pled guilty to first degree murder, the elements of which were "knowingly caus[ing] the death of a person fourteen (14) years of age or younger at the time the murder was committed."  Ark. Code Ann. § 5-10-102 (a)(3). Mrs. Pedraza pled guilty to permitting the abuse of a minor, the elements of which were "being a parent, guardian, or person legally charged with the care or custody of a minor, he or she recklessly fails to take action to prevent the abuse of a minor.  Permitting abuse of a minor is a: Class B felony if the abuse of the minor: Caused serious physical injury or death to the minor."  Ark. Code Ann. § 5-27-221 (a) and (c)(1)(C).  Mr. Pedraza's complaint is that at Mrs. Pedraza's sentencing trial, the prosecutor referred to Aubriana's death as "an accident."  (Doc. No. 2 at 12.)  The word "accident" did not act to deprive Petitioner of due process for three reasons.  First, the overwhelming evidence, advanced by the State at both trials, was that Petitioner engaged in a systematic campaign of abuse aimed at both Aubriana and Victoria, which culminated in Aubriana's death on the last weekend of February 2012.  The word "accident" did not contradict

or even diminish that evidence. Furthermore, this evidence corroborated Petitioner's own statement at his plea hearing that he knowingly caused Aubriana's death by striking her in the stomach. Second, the elements of the offenses to which Mrs. Pedraza and Petitioner pled guilty are different, particularly in the culpable mental state necessary to sustain a conviction. I do not find that the word "accident" is entirely incompatible with the reckless mental state necessary for a conviction under § 5-27-221. Third, after reviewing this record, I agree with Respondent's assertion that the word "accident" in Mrs. Pedraza's case was a stray remark by the prosecutor and nothing more. (Doc. No 12 at 49, n.2.) Finally, Mrs. Pedraza's sentencing, and therefore the prosecutor's remark, took place <u>after</u> Petitioner's sentencing, so it would have been impossible for his lawyers to raise an issue that was unknown and unknowable to them at the time. Because this claim is both procedurally defaulted and meritless, it should be dismissed.

### C.    Claims of False Testimony by the Medical Examiner and Failure of Counsel to Use DHS Report to Rebut Medical Examiner's Testimony

Petitioner actually raises two related but distinct claims relating to the medical examiner's testimony. First is a stand-alone claim that the testimony was false,[6] and that using false testimony to secure his conviction violated his due process rights. Second is the claim that his lawyers were constitutionally ineffective because they failed to use the report of Division of Family Services of the Arkansas Department of Human Services (Doc. No. 2 at 27) to impeach the medical examiner. Both claims are procedurally barred, meritless, and should be denied.

Like his claim that the State used inconsistent theories to prosecute his wife as opposed to himself, Petitioner did not advance his claim of false testimony by the medical examiner through the state courts. Accordingly, it is also procedurally defaulted and should be denied. However,

---

[6] In his reply Mr. Pedraza says the testimony was unsupported. (Doc. No. 19 at 3.)

even if this particular claim is not procedurally defaulted, Petitioner has not advanced anything

beyond conclusory statements that would support the idea that Dr. Erickson's testimony was false

or unsupported:

> [T]he State prosecutor knowing [sic] and recklessly used false testimony in violation of due process in order to enhance his chances of conviction.  There is no doubt that the pathologist's [the medical examiner's] analysis was flawed and that his conclusions exceeded the limits of science where the pathologist (the State's expert) testified that the numerous non-life threatening traumas occurring prior to the blow which caused the internal trauma resulting in death was [sic] also the cause [sic] of death.  Non-life threatening - some of which had long since healed, was also the cause of death?  False, and conceivably raises serious concerns due to the aura of special reliability and trustworthiness of the expert testimony.

(Doc. No. 2 at 12.)  Petitioner offers no competent medical evidence (or any evidence at all) that

supports his assertion that Dr. Erickson's testimony was false or unsupported.  Asserting there is

no doubt that his analysis was flawed without some evidence to substantiate that theory is a

conclusory statement, as is his assertion that the prosecutor knew the evidence was false.  There is

simply no evidence in the record tending to validate either premise.  These are conclusory

statements, and as such, are insufficient to grant habeas relief.  "First, the habeas petition, unlike a

complaint, must allege the factual underpinning of the Petitioner's claims. See Habeas Corpus Rule

2(c) ('The petition . . . shall specify all the grounds for relief which are available to the petitioner

. . . and shall set forth in summary form the facts supporting each of the grounds thus specified')."

*McFarland v. Scott*, 512 U.S. 849, 860 (1994) (O'Connor, J., concurring in part and dissenting in

part).  So the claim should be denied on that basis alone.  And even taking at face value the

argument that Petitioner is attempting to make - that the non-life threatening injuries could not

logically have contributed to Aubriana's death - takes the medical examiner's testimony out of

context.  It is clear to me, after reading his testimony, that Dr. Erickson emphatically stated that

Aubriana died from a single blow to her abdomen.  (Doc. No. 12, Ex. A at 1697.)  With respect to

the other injuries - showing a consistent pattern of abuse on Aubriana - about which he testified, he said, "Primarily there was one major injury, but that major injury fell within the scope of a number of other injuries. You can separate those out or you can look at them as a whole. You can be a splitter or a grouper; I'm a grouper." (*Id.*) There is no logical inconsistency to the doctor's testimony. Petitioner's argument lacks merit.

The claim that his counsel was ineffective for failing to use the DHS report to impeach the doctor's testimony was not raised in the state courts. It is, therefore, procedurally defaulted and should be denied. Moreover, it too, lacks merit. Defense counsel's performance in a sentencing trial is evaluated under the framework articulated in *Strickland v. Washington,* 466 U.S. 668 (1984): "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. *Strickland* applies to contested trials, sentencing hearings (*id.*) and guilty pleas (*Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). The *Strickland* test has two prongs - unprofessional conduct of counsel and that the unprofessional conduct had a reasonable probability of prejudicing the outcome of the proceeding. The decisions of trial defense counsel are entitled to a strong presumption of professional conduct, and the defendant or habeas petitioner seeking to overturn a conviction on an ineffective assistance of counsel claim bears the burden of overcoming that presumption. *Strickland*, 466 U.S. at 689. I find that Petitioner's claims of ineffective assistance on this claim (as well as all others he raises in his Petition) fail both prongs of the *Strickland* test. The DHS report, while possibly helpful standing alone, was simply incapable of mitigating the overwhelming evidence of Mr. Pedraza's guilt. Given the strength of the State's case, the written determination of a state agency on a child-abuse investigation would likely have had little if any

effect on the minds of jurors.  Moreover, even if counsel had been aware of the DHS report, they might very well have concluded that introducing the report would only serve to inflame the jurors, because the report was for an investigation that predated Aubriana's death by weeks.  So leaving the report out of evidence could very well have been a perfectly reasonable, professional judgment to make in light of the circumstances of this case.

Petitioner has offered nothing by way of showing that his lawyers committed an unprofessional error in omitting the DHS report - i.e., that a reasonably competent criminal defense lawyer would have introduced it.  Nor has he offered anything at all that would show that but for the omission of the report, the outcome of his sentencing would have been different.  This claim should be dismissed.

### D.    Claims that Counsel Were Ineffective for Failing to Raise Evidence of Other Adults Abusing Aubriana and Mrs. Pedraza's Violent Tendencies

Petitioner raises claims of ineffective assistance of counsel in this Petition because his lawyers did not raise, at his trial, evidence that other adults - particularly Fatima Thomas - may have abused Aubriana, thus accounting for some of her injuries.  A related claim is that his lawyers did not raise evidence of Mrs. Pedraza's violent tendencies at trial.[7]  Petitioner, in turn, did not raise these issues in the state courts.  They are, therefore, procedurally defaulted and should be dismissed.  Furthermore, on the merits, having found above that Petitioner's guilty plea was knowingly and voluntarily entered, then it follows that his lawyers' decision to counsel him to

---

[7] Mr. Pedraza points to Exhibit 5 to his habeas Petition to support the idea that Victoria had violent tendencies.  (Doc. No. 2 at 18, 31).  Exhibit 5 to the Petition is an extract of an Order from the Drew County Circuit Court in part summarizing an Arkansas State Police interview with Timothy Coke, Aubriana's father.  It relates that Mr. Coke detailed physical abuse he suffered at Victoria's hands.  It says nothing about her abusing Aubriana.  This evidence, if offered on the merits, would have had a hard time surviving a relevancy or 404(b) objection.

accept a guilty plea was well within the limits and scope of constitutionally acceptable assistance. Having said that, once the decision was made to plead guilty and attempt to mitigate the Petitioner's sentence, it makes perfect sense that his lawyers did not then attempt to blame others (or imply shared responsibility) for Aubriana's death.   It would have been a very reasonable conclusion for his lawyers to draw that whatever benefit Mr. Pedraza would have enjoyed from the jury seeing him as having accepted responsibility for his actions would have eroded, if not evaporated, by turning around and trying to place that responsibility on others.  This is the type of presumptively reasonable action on the part of counsel contemplated by *Strickland*.  Whether these claims are procedurally defaulted, lack merit, or both, they should be dismissed.

### E.     Ineffective Assistance of Counsel in Failing to Rebut the Medical Examiner's Testimony

Giving Mr. Pedraza all benefit of doubt, it appears Petitioner did raise this issue in his Rule 37 proceeding and on appeal from the denial of Rule 37 relief.  The Arkansas Supreme Court dealt with the issue and said:

> Pedraza first argues in this appeal that the trial court erred in its denial of his claim that counsel failed to conduct an adequate investigation of the case and obtain medical evidence to refute the medical evidence presented by the State as to the cause of the victim's death. In a related allegation, Pedraza contends that counsel failed to spend enough time with him to discuss trial strategy and the overall theory of the defense. He asserts that, had counsel spent greater time with him, valuable defenses, such as his mental dysfunction, would have been discovered. Pedraza did not contend in his Rule 37.1 Petition that, but for counsel's failure to spend more time with him or to investigate further, he would not have entered a plea of guilty, and he did not contend that there was any specific information that could have been uncovered by more time spent with him or with a more extensive investigation by counsel.

> To prevail on a claim of ineffective assistance of counsel for failure to investigate, the Petitioner must allege some direct correlation between counsel's deficient performance and the decision to enter the plea, or the Petitioner is procedurally barred from postconviction relief. *Mancia v. State*, 2015 Ark. 115, 459 S.W.3d 259.  Conclusory statements to that effect, without an alleged factual basis, do not suffice.  *Id.*  As Pedraza did not offer any specific information that could been

> discovered that would have changed his decision to enter his plea, he did not show that counsel made any error.  *See Sandoval-Vega v. State*, 2011 Ark. 393, 384 S.W.3d 508.[8]

*Pedraza v. State*, 2016 Ark. 85, at *3-4.  This issue has been addressed by the state courts, and as such, is subject to a deferential analysis under § 2254 (d)(1).  *See Davis v. Grandlienard,* 828 F.3d 658, 664 (8th Cir. 2016).  The Arkansas Supreme Court's analysis of that claim was not contrary to, or an unreasonable application of any federal standard.  In order to meet the "cause and effect" test of *Strickland*, the Petitioner bears the burden of showing the habeas court the reasonable probability of a different outcome, had counsel's efforts been within the broad spectrum of reasonableness.  In this case, that necessarily means Petitioner would have to show the Arkansas Supreme Court, and this Court, what evidence could have been discovered by his lawyers through investigation that would have rebutted the medical examiner's testimony.  I have explained above that neither the DHS report nor the Petitioner's bald assertions that Dr. Erickson's testimony was "false" or that his analysis was "flawed" meet that standard.  So both on a deferential analysis and on the merits, this claim fails and should be dismissed.

### F.    Failure to Object to Certain Parts of the Medical Examiner's Testimony

In a related claim, Petitioner says his counsel were constitutionally ineffective when they failed to object to Dr. Erickson's testimony - particularly about the evidence of multiple non-life threatening injuries on Aubriana - and the introduction of his autopsy report into evidence.  Like many other claims in the instant Petition, this one does not appear to have been raised with the state courts at all, and as such, it is procedurally defaulted.  It should be denied for that reason.

---

[8] Mr. Pedraza's assertion that his attorneys did not spend enough time with him developing his case is not raised in the instant Petition.

28

However, in support of this particular claim, he cites the Drew County Circuit Judge's opinion regarding that evidence:

> This Court makes brief observation about matters into which it did not intrude. The State in its capital count was relying to some extent on the medical examiner's report and testimony that while the "blow" to Aubriana's abdomen and resulting in internal trauma was the cause of death, the pathologist <u>further</u> opined that the previous multiple and none [sic] life-threatening traumas from her head (some healed) to her extremities, resulted in her death. He said that some of these multiple injuries were months old. This, the State needed, to support its theory of a heinous homicide. The State used this expansive, unobjected to medical opinion at Daniel Pedraza's sentencing hearing. Going only on its own recollection- not the transcript- the Court recalls a 404 objection (overruled) to Daniel Pedraza's previous alleged domestic abuse but <u>not</u> any objection to the examiner's testimony, nor that portion of his written report linking all these previous injuries together <u>also</u> as the cause of her death. At that time the Court thought the expert's more expansive expert opinion to be unsupported by his own description of these healed injuries - and perhaps objectionable on that basis - lack of foundation. But, the Court remains silent.

(Doc. No. 2 at 32) [Emphasis in the original].

I first note that the comments cited are by their own admission speculative - "perhaps objectionable." Second, while the medical examiner's opinion about the non-life threatening injuries being the cause of death (or contributing to it) *may* have been objectionable and excludable from evidence, the facts of his findings in the autopsy were almost certainly admissible. Those autopsy findings included evidence of multiple injuries to Aubriana's head, chest, abdomen and extremities, all corroborating Mrs. Pedraza's testimony about the things Petitioner did to Aubriana over the time they lived with him.

Defense counsel could not tell in advance how the trial judge would rule on any objection, and a reasoned, professional judgment could well have been reached that the risk of being overruled - and thus drawing more attention to this difficult and emotionally-charged evidence - was not worth the potential reward. This is especially true given that Mrs. Pedraza's testimony

was already before the jury.  Again, because of procedural default and on the merits, this claim should be dismissed.

### G.    Denial of Right to a Public Trial

This is yet another claim Petitioner raises for the first time in his Petition before this Court. It is procedurally defaulted and should be denied.  Furthermore, the Petitioner does not advance any evidence here that his trial (he is particularly complaining about his plea hearing) was *not* held in public, other than the fact that it was held on a Saturday.  The record is devoid of any indication that the state trial court affirmatively closed the Petitioner's plea hearing, that it refused a request for the plea to be open to the public, or that it failed to open the courthouse doors on Saturday.  In fact, the only mention of the public aspect of the plea hearing on the record came from the trial judge: "I'm not borrowing trouble — How many pleas have y'all seen fall through after they told the lawyer they'll admit to certain things?  And this is too sensitive a matter; and it has to be done in public so it wouldn't be able to be disregarded."  (Doc. No 12, Ex. A at 1527.)  The judge's statement came at the close of business on Friday, May 31, 2013, after counsel for both sides revealed they had been engaged in plea negotiations.  (*Id.* at 1512.)  The plea hearing took place on the next day, Saturday, June 1, 2013.  (*Id.* at 898.)  Moreover, it appears certain that all of the Petitioner's sentencing trial was conducted in public.  Again, due to procedural default and lack of merit, this claim should be dismissed.

### H.    Denial of Right to Be Present During Proceedings

Petitioner's final claim, that he wasn't present at certain stages of his proceedings also appears for the first time before this Court.  He never raised it with the state courts.  For that reason, it is procedurally defaulted.  On the merits, Mr. Pedraza complains that his right to be present was violated twice - once when he was not present for Mrs. Pedraza's deposition and once when he

was not present for the discussion between the attorneys and the trial judge regarding the possibility that he might plead guilty. (Doc. No. 2 at 20.) A criminal defendant's right to be present attaches to "any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Martin v. Fanies*, 365 Fed. Appx. 736 at 739 (8th Cir. 2010) (*citing Kentucky v. Stincer,* 482 U.S. 730, 745 (1987). The right further turns on whether the defendant's presence can contribute, meaningfully, to the issues before the court: "In addition, courts have held that a defendant's absence is not constitutionally problematic where the legal issue hinges on few facts that are known to the court. [*United States v.*] *Bowe*, 221 F.3d at 1189 ('In particular, hearings [with the defendant] are unnecessary when there is no dispute about the facts underlying the request for a continuance.')." *United States v. Moe*, 536 F.3d 825, 830 (8th Cir. 2008). Addressing first Mr. Pedraza's absence from the court session at which his lawyers and the prosecutor discussed the fact that he might plead guilty and therefore requested a continuance,[9] I have no difficulty concluding that Petitioner's absence from that discussion did not violate his right to be present at trial. The facts - that the lawyers were in negotiations - were not the subject of meaningful dispute. The sole question before the court at that time was whether it would grant a continuance of the day's proceedings to determine whether, in fact, Petitioner would plead guilty. He did. There is no constitutional violation in this issue.

More troubling is Petitioner's allegation that he was absent from Mrs. Pedraza's deposition. That was clearly a proceeding in which facts critical to the case were developed. She was the only eyewitness to the events leading to Aubriana's death. Having said that, under Arkansas law, a criminal defendant does not have a right to depose witnesses. *Caldwell v. State*, 319 Ark. 243,

---

[9] The record makes no mention of Mr. Pedraza's presence or absence as court convened on May 31, 2013. (Doc. No. 12, Ex. A at 1511.) Mr. Pedraza says he was not there. (Doc. No. 2 at 14.)

247-48 (1995).  If the Petitioner has no right to a deposition at all under Arkansas law, then it follows that he has no right, as a matter of federal constitutional law, to be present at such a deposition.  I find no merit in either of these arguments, and they are both procedurally defaulted. They should be dismissed.

Finally, I have considered whether Mr. Pedraza has cause for his procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012).  Although questions arise as to whether the United States Supreme Court's holding in *Martinez* could generally lead to a showing of "cause" for procedurally defaulted claims, I conclude it does not apply in this case.  Assuming *Martinez* applies, this Court would perform a merits review of the defaulted claims if (1) the claim of ineffective assistance was substantial, (2) the "cause" was that Mr. Pedraza had no counsel in the post-conviction proceeding, (3) the Rule 37 proceeding was the initial review proceeding with respect to the ineffective assistance of counsel claim, and (4) it was highly unlikely that Mr. Pedraza had a "meaningful opportunity" to raise his ineffective assistance claims on direct appeal. *Trevino v. Thaler*, __ U.S. __, 133 S. Ct. 1911 (2013).  Given the facts in this case and the claims raised, under *Martinez* and *Trevino*, I conclude that, under the first prong of this analysis, none of Mr. Pedraza's defaulted claims rises to the level of "substantial."  Thus, all procedurally barred claims should be dismissed.

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  In cases where the Petitioner's claims are procedurally barred, a district court must consider the following factors when determining whether it should issue  a certificate of appealability:  "(1) if the claim is clearly procedurally defaulted, the certificate should

not be issued; (2) even if the procedural default is not clear, if there is no merit to the substantive constitutional claims, the certificate should not be issued; but, (3) if the procedural default is not clear and the substantive constitutional claims are debatable among jurists of reason, the certificate should be granted." *Khaimov v. Crist*, 297 F.3d 783, 786 (8th Cir. 2002) (*citing Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000)); *see also Langley v. Norris*, 465 F.3d 861, 863 (8th Cir. 2006).

In this case, one or more of three criteria apply to all of Petitioner's claims. They are either procedurally defaulted, adjudicated according to the correct federal standard or the reasonable application of the federal standard, or without merit or some combination of all three. Therefore, no certificate of appealability should be issued.

## IV. CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1. Mr. Pedraza's § 2254 Petition for Writ of Habeas Corpus (Doc. No. 2) be DISMISSED without prejudice.

2. A certificate of appealability should not be issued.

DATED this 21st day of August, 2017.

JOEL J. VOLPE
UNITED STATES MAGISTRATE JUDGE